```
                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
                      SAN ANTONIO DIVISION
```

| | |
|---|---|
| **ANDREW MARTINEZ and RICHARD B. MENDEZ,** | \* <br> \* <br> \* |
| Plaintiffs, | \* <br> \* |
| v. | \*  CIV. NO. SA-08-CA-733-OLG <br> \* |
| **TOYOTA MOTOR MANUFACTURING, TEXAS, and AEROTEK, INC.,** | \* <br> \* <br> \* |
| Defendants. | \* |

## MEMORANDUM AND RECOMMENDATION

Before the Court is plaintiffs Andrew Martinez's and Richard B. Mendez's Motion for Conditional Class Certification and for Notice to Putative Class Members. (Docket no. 46). Defendants, Toyota Motor Manufacturing, Texas, and Aerotek, Inc., have responded. (Docket nos. 77 and 78). Upon consideration of the motion, responses, and applicable law, the Court believes that the motion to conditionally certify should be **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, Andrew Martinez and Richard Mendez, sued their former employer, Aerotek, Inc.[1], along with various Toyota companies[2], on behalf of themselves and other similarly-situated employees pursuant to the Fair Labor Standards Act ("FLSA") for

---

[1] Aerotek, Inc. is a national staffing agency that provided temporary employees to work at Toyota Motor Manufacturing, Texas, Inc.

[2] In addition to Toyota Motor Manufacturing, Texas, plaintiffs also sued Toyota Motor Engineering & Manufacturing North America, Inc., Toyota Motor Manufacturing, Alabama, Inc., Toyota Motor Manufacturing, Indiana, Inc., Toyota Motor Manufacturing, Kentucky, Inc., and Toyota Motor Manufacturing, West Virginia, Inc.

failure to pay time-and-a-half their regular rates of pay for hours worked and off-the-clock hours worked in excess of forty hours per week. **Docket no. 1**, Collective Action Complaint. Plaintiffs alleged that prior to their shifts at the Toyota plant, team members routinely were required to pre-assemble parts and set up mats and that they were not compensated for this time. **Id**. Plaintiffs further alleged that defendants did not pay overtime unless an employee worked beyond 0.1 of an hour increment or six minutes. **Id**.

On November 6, 2008, the District Court granted defendants Toyota Motor Engineering & Manufacturing North America, Inc., Toyota Motor Manufacturing, Alabama, Inc., Toyota Motor Manufacturing, Indiana, Inc., Toyota Motor Manufacturing, Kentucky, Inc., and Toyota Motor Manufacturing, West Virginia, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction and/or Failure to State a Claim regarding plaintiffs' claims. ***See* Docket no. 16**. The District Court also granted Toyota Motor Manufacturing, Texas, Inc.'s Motion to Compel Arbitration and Stay Court Proceedings regarding the claims of other named plaintiffs, severing those claims from this action and docketing such claims under a new cause number, SA-08-CA-0912-OG. ***See* Docket no. 17**. As a result, Martinez and Mendez were the only remaining plaintiffs in this suit.

Subsequently, defendant, Aerotek, Inc. filed a motion to dismiss plaintiffs Martinez's and Mendez's waiting-in-line and pre-

2

assembly of parts claims. *See* **Docket no. 19.** Initially, the undersigned recommended that this motion be granted as to both claims; with respect to the pre-assembly claims, the Court found that plaintiffs Martinez and Mendez failed to present specific allegations in their affidavits that they personally pre-assembled parts off-the-clock. *See* **Docket no. 49.** However, on motion for reconsideration, plaintiffs argued their affidavits inadvertently omitted a relevant paragraph and submitted amended affidavits that alleged Martinez and Mendez had pre-assembled parts off-the-clock. *See* **Docket no. 53.** Consequently, the undersigned issued an amended recommendation, and the District Court denied defendant's motion as to plaintiffs' pre-assembly of parts claims. **Docket no. 61.** The Court now considers plaintiffs Martinez's and Mendez's request to conditionally certify this case as a collective action.

**II. ANALYSIS**

*A. Collective Actions*

Title 29 U.S.C. § 216(b) of the FLSA permits an employee to bring an action against his employer "[on] behalf of himself ... and other employees similarly situated." However, "[n]o employee shall be a party plaintiff to such an action unless he gives his consent in writing to become a party and such consent is filed in the court in which such action is brought." *Id.* Thus, while a Rule 23 class action allows plaintiffs to "opt out" of the class, a § 216(b) plaintiff is required to first "opt in" to the class. *See* **Fed.R.Civ.P. 23.** Two methods have been recognized for

3

determining whether a claim should proceed as a collective action pursuant to 29 U.S.C. § 216(b): the two stage test first typified by *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D.N.J. 1987); and the Rule 23 class certification analysis, requiring consideration of the Rule 23 factors-numerosity, commonality, typicality, and adequacy of representation. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-15 (5th Cir. 1995). While the Fifth Circuit has not adopted a specific test, most federal courts have employed the *Lusardi* two-step test. *Pedigo v. 3003 South Lamar, LLP*, 2009 WL 3496038, at *2 (W.D. Tex. Oct. 30, 2009)(citing *Morales v. Thang Hung Corp.*, 2009 WL 2524601, at *2 (S.D.Tex. Aug. 14, 2009)); *see also Mooney*, 54 F.3d at 1214.

The *Lusardi* approach involves first determining whether the proposed plaintiffs are "similarly situated". *Lusardi*, 118 F.R.D. at 359. Under this approach, the Court conditionally certifies a class provided there are "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Mooney*, 54 F.3d at 1214, n.8 (quoting *Sperling v. Hoffman-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988)). This initial determination, based on the pleadings and affidavits, is not demanding and will generally result in "conditional certification" of a representative class to whom notice is provided along with the opportunity to "opt in." *Id.* at 1214. However, mere conclusory allegations are insufficient and do not satisfy movant's § 216(b) burden. *See H & R. Block, Ltd. v. Housden*, 186

F.R.D. 399, 400 (E.D. Tex. 1999).

If the case is conditionally certified, it proceeds through discovery as a representative action and after discovery is completed, the second step of this analysis is triggered, typically when the defendant files a motion for decertification. *See Housden*, 186 F.R.D. at 400. At this second stage, the Court is required to make a factual determination regarding whether the putative class members are, in fact, "similarly situated." *Id.* While the *Lusardi* approach is more lenient than the Rule 23 analysis, certification is by no means automatic. *See Badgett v. Texas Taco Cabana, L.P.*, No. H-05-3624, 2006 WL 2934265, at *2 (S.D.Tex. Oct. 3, 2006). In making its recommendation regarding an initial determination as to whether notice of the plaintiffs' action should be given to potential class members, this Court applies the *Lusardi* approach.

*B.  Overtime Claim*

Plaintiffs, Martinez and Mendez, alleged in their complaint that they, and all other similarly-situated team members/assembly line workers were not paid time-and-a-half their regular rates of pay for hours worked and off-the-clock hours worked in excess of 40 hours per week and were routinely required to pre-assemble parts and set up mats prior to their shifts. **Docket no. 1,** Collective Action Complaint, pg. 4. Plaintiffs further alleged that they and all other similarly-situated team members/assembly line workers were subject to the common policy or plan of defendants to

willfully violate the FLSA.  **Docket no. 1,** Collective Action Complaint, pg. 4.  Plaintiffs estimated that there are more than 10,000 persons who qualify as putative class members.  *Id.* at pg. 8.

Martinez and Mendez initially alleged in their affidavits that:

> Some team members have to pre-assemble parts prior to their shifts. Toyota runs a very tight time line on how many seconds it takes to perform each pitch. There are taped lines on the floor to show where a pitch starts in the assembly process and where it ends, so team members do not intrude into another members' pitch area. My group's pitches average between 76 and 113 seconds. Toyota's group leaders and team leaders constantly tell us team members that no matter what, the assembly line cannot stop. However, several parts that go onto the vehicle required some pre-assembly before the parts are able to be installed. This could include installing clips, grommets, and other things into the part that had to be installed.

**Docket no. 1,** Collective Action Complaint, Appendices E and F. Subsequently, however, plaintiffs submitted amended affidavits in support of their motion for reconsideration that alleged the following:

> I had to pre-assemble clips into the "aprons" on one of my pitches. We were not allotted enough time to both pre-assemble the "aprons" and install the "aprons" onto the vehicle. Therefore, in order to avoid stopping the assembly line because I ran out of "aprons" and getting in trouble, team members, including myself, would pre-assemble the "aprons" off-the-clock. If we did not pre-assemble the "aprons" off-the-clock, we would have to stop the assembly line within the first five minutes of the shift starting because we could not both pre-assemble "aprons" and install the "aprons" onto the vehicle (as well as perform the other tasks on that pitch) in the amount of time allotted. We team members only have enough time on this pitch to install a fully-assembled "apron."

6

> We team members would come in 15 to 20 minutes early before work started and pre-assemble these "aprons" because we would not have the necessary time to do it once the line started. In addition, we would cut our two 10-minute breaks, as well as our lunch break short to go back and pre-assemble these "aprons" so we would not get in trouble for stopping the line. No one could keep up with the assembly line unless they pre-assembled the "aprons" off-the-clock. Toyota never gave us the time during the shift to pre-assemble the "aprons," so we had to do it on our time off-the-clock in order to keep up with the assembly line. The Toyota group leaders and supervisors have full knowledge of this off-the-clock pre-assembly activity.

**Docket no. 53**, Amended Affidavits of Martinez and Mendez.  While the Court found that the factual allegations in plaintiffs' amended affidavits were sufficient to state a claim to relief that was plausible on its face and to raise a right to relief above the speculative level, the issue now before the Court is whether plaintiffs have sufficiently established they are similarly-situated with the class they intend to represent.  To do this, there must be "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."  *Mooney*, 54 F.3d at 1214 n.7 (quoting *Sperling*, 118 F.R.D. at 407).

In their motion filed on May 26, 2009, plaintiffs maintained that they are "similarly situated" to other plaintiffs identified in their notice as "current/former team members/assembly line workers employed by Aerotek, Inc. [who] worked at Toyota Motor Manufacturing Texas Plant" at any time from September 5, 2005 to the present, and initially filed their motion to conditionally

7

certify this action in May of 2009. **Docket no. 46.** However, in depositions taken five months later, plaintiffs admitted that they had no knowledge of what happened in any other area of the plant, other than the Final 1/Chassis 2 Line, and that they had no knowledge of the record keeping practices for other group leaders outside Final 1/Chassis 2 Line. **Docket no. 77**, exh. A, Deposition of Mendez, pgs. 22, 49, 55, 57; exh. B, Deposition of Martinez, pgs. 32; 90. Further, both plaintiffs knew the former plaintiffs, Cardenas, Sims and Suniga because they worked in the Final 1/Chassis 2 Line. *Id.*, exh. A, pg. 59; exh. B, pgs. 70-71. Martinez further admitted that he was on the "red shift," that there were only 25-30 people on the red shift, and that he never worked with the white shift. *Id.*, exh. B, pg. 20. In fact, when asked for names of team members that came into work 15-20 minutes early to pre-assemble parts, Martinez could only identify himself, Cardenas and Sims, production team members all assigned to the same area as Mendez and Martinez. *Id.*, pg. 92.

In support for its position that the plaintiffs are not similarly-situated, defendant, TMMTX, submitted the affidavit of Todd Williams, an Assistant Manager for the company who stated the following:

> 4. TMMTX operations are separated into various departments, the largest of which is the Production Department. The Production Department is comprised of multiple groups of processes, which are generally referred to as Production Areas. There are nine (9) Production Areas and each is solely responsible for a unique aspect of the production process. The different

Production Areas are Assembly, Assembly Conveyance, Kaizen, Paint, Plastics, Press/Stamping, Quality Assurance, Quality Inspection, and Weld. Each Production Area, whether Assembly, Weld, Plastics or otherwise, is charged with performance of stand alone tasks that are not performed in any other Production Area. Each Production Area is highly specialized for the tasks or processes which it performs and is supervised by its own separate Manager.

5. The nine Production Areas are broken down further into distinct departments or sections based upon particularized functions. Within just the one Production Area of Assembly, there are approximately six (6) Assistant Managers (including myself) supervising approximately 24 Group Leaders who are responsible for multiple and different Lines of production. The different Lines of production within Assembly include Engine, Axle, Frame 1, Frame 2, Final l/Chassis 2, Final 2, Final 3/Chassis 1, Chassis 3, Trim 1 North, Trim 1 South, Trim 2 North, and Trim 2 South.

6. All Team Members, both Toyota employees and Production Temporary workers, are assigned to one of the nine different Production Areas, and then to a specific department or section within that Production Area. Team Members assigned to the Production Area of Assembly are further assigned to specific Lines (e.g. Engine, Axle, Frame, Chassis, etc.). Each Line is supervised by Group Leaders who are responsible for the day to day functioning of Team Members assigned to his or her Line.

7. The Lines within Assembly are broken down by "pitches". Each Line has, approximately, between five (5) and twenty (20) pitches. Pitches are the distinct areas along the Line where specific assembly tasks are performed. Team Members are assigned to specific pitches for which they have received specialized training unique to their particular pitch. Each work shift for each Line is supervised by a different Group Leader. Like the Team Members, Group Leaders do not rotate between or among multiple Production Areas or Lines. Depending on all levels of production, the number of Group Leaders can exceed 65 for all Production Areas. Within just Assembly, there are typically 20 to 25 total Group Leaders supervising different Lines and shifts.

8. A particular team member's assignment is determined

9

based upon the team member's training and job certification. The Production Area to which Martinez and Mendez were both assigned was Assembly. Within Assembly, they were assigned to, and solely worked on, selected pitches on the Final 1/Chassis 2 Line. As Team Members, Martinez and Mendez did not rotate between or among other Production Areas. Nor did Martinez and Mendez rotate outside of the Final l/Chassis 2 Line. As a result, Martinez and Mendez did not perform any of the job duties or tasks associated with any Production Area other than Assembly and did not perform any job duty or task on any Line other than a limited portion of Final l/Chassis 2. Martinez and Mendez, at the time of their employment, worked for only one or two Group Leaders assigned to Final 1/Chassis 2.

9. Pitches along a Line are grouped into Zones. Each Zone is then supervised by a Team Leader (who reports to the Group Leader). While Team Leaders do rotate or move between different Lines, depending on their training and business need, they may assist in one or two Zones within a Line under the same Group Leader. Each Zone consists of several pitches, typically four, with one Team Member assigned to each pitch. Final l/Chassis 2, the Line on which Martinez and Mendez worked, has 18 pitches. Each of those 18 pitches has unique job duties and tasks specific to that particular pitch. It is my understanding that Martinez was certified to work in four to five (4-5) of the 18 pitches and Mendez in two (2).

10. Each eight (8) hour shift, Team Members are assigned to rotate every two (2) hours to a different pitch on their Line (provided the Team Member is certified to work on that pitch). Generally, the two (2) hour rotation between pitches is within the Team Member's same Zone with the same Team Leader. Team Members do not rotate outside their Line or to a different Group Leader. A Team Member's rotation will not include a pitch outside his or her Line, nor one for which that Team Member has not received training and obtained certification. As a result, each Team Member's rotation assignment on his or her Line depends upon the number of pitches for which the Team Member has been trained and certified. As stated, Martinez was certified to perform work on four to five (4-5) of the 18 pitches, and Mendez was certified to perform work on only two (2) pitches. Neither Martinez nor Mendez was certified to work, nor did they work, on any other Line, in any other Production Area, or for any

10

>    other Group Leader outside these limited pitches on Final
>    l/Chassis 2.

**Docket no. 77**, exh. C, pgs. 1-2.  Further, defendant, Aerotek, Inc. states that it has a policy that individual overtime is the responsibility of the team leader; the time is recorded through group time card sheets; and the group time card sheets are submitted by the group leader.  **Docket no. 78**, exh. 6.  Moreover, Aerotek's policies prohibited team members from working off-the-clock or not recording hours worked.  *Id.*, exh. 7, Aerotek's Policies and Procedures Statement, pg. 2.

Thus, out of nine Production Areas in the TMMTX plant, plaintiffs worked in only one, Assembly.  The different Lines of production within Assembly include Engine, Axle, Frame 1, Frame 2, Final l/Chassis 2, Final 2, Final 3/Chassis 1, Chassis 3, Trim 1 North, Trim 1 South, Trim 2 North, and Trim 2 South.  Plaintiffs worked only in the Final 1/Chassis 2 Line.  Martinez and Mendez did not perform any of the job duties or tasks associated with any Production Area other than Assembly and did not perform any job duty or task on any Line other than a limited portion of Final l/Chassis 2.  They had no knowledge of what happened in any other area of the plant.

The Lines within Assembly are further broken down by "pitches".  Team Members are assigned to specific pitches for which they have received specialized training unique to their particular pitch.  Each work shift for each Line is supervised by a different Group Leader.  Within just Assembly, there are typically 20 to 25

total Group Leaders supervising different Lines and shifts. Like the Team Members, Group Leaders do not rotate between or among multiple Production Areas or Lines. Martinez was certified to work in four to five (4-5) of the 18 pitches and Mendez in two (2). Martinez and Mendez, at the time of their employment, worked for only one or two Group Leaders assigned to Final 1/Chassis 2. Therefore, they could not be similarly-situated to other employees working under other Group Leaders in other areas of the facility.

Plaintiffs did not file a reply to defendants' responses. Based on the pleadings and affidavits, the Court believes that plaintiffs have failed the first step of the two-step approach. Although plaintiffs are correct that the standard for satisfying the first step is "fairly lenient," plaintiffs have nevertheless failed to make "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination." *See Housden*, 186 F.R.D. at 400(quoting *Mooney*, 54 F.3d at 1214 n. 8). Instead, plaintiffs' only evidence consists of unsupported assertions of violations that are insufficient to meet plaintiffs' burden.

Although affidavits were provided, they were, for the most part, identical, and consisted entirely of conclusory statements that do not even meet a "modest factual showing." Further, these affidavits were refuted by plaintiffs' subsequent deposition testimony which revealed that plaintiffs have no knowledge of "a single decision, policy, or plan" and can only testify regarding

practices that allegedly occurred to the "red shift" in the Final 1/Chassis 2 line, which according to Martinez was made up of twenty-five to thirty employees. **Docket no. 77**, exh. B, pg. 20. Further, plaintiffs present no evidence refuting defendant's written policy that individual overtime is the responsibility of the team leader, and do not argue that they submitted a request for over time hours and were denied payment.

Given that the evidence presented by plaintiffs fails to sufficiently demonstrate the existence of a similarly-situated class of employees and plaintiffs' complaint and affidavits in support thereof contain unsupported assertions of wide-spread pre-assembly of parts off-the-clock, the Court should decline to certify a collective action in this case. *See Housden*, 186 F.R.D. at 400(providing that unsupported assertions of wide-spread FLSA violations did not satisfy the movant's § 216(b) burden).

## RECOMMENDATION

It is the recommendation of the Magistrate Judge that plaintiffs' motion for conditional class certification be **DENIED.**

### Instructions for Service and
### Notice of Right to Appeal/Object

The United States District Clerk shall serve a copy of this United States Magistrate Judge's Memorandum and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Pursuant to Title 28 U.S.C. Section 636(b)(1) and Federal Rule of Civil Procedure 72(b), any party who desires to object to this report must serve and file written objections to the Memorandum and Recommendation within 10 days after being served with a copy unless this time period is modified by the district court.  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections. ***Such party shall file the objections with the clerk of the court, and serve the objections on all other parties and the magistrate judge.***  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.  ***See Thomas v. Arn***, 474 U.S. 140, 150 (1985).  Additionally, any failure to file written objections to the proposed findings,

14

conclusions and recommendation contained in this Memorandum and Recommendation within 10 days after being served with a copy shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  ***Douglass v. United Servs. Auto. Ass'n***, 79 F.3d 1415, 1428 (5th Cir. 1996).

**SIGNED** November 19, 2009.

_____
JOHN W. PRIMOMO
UNITED STATES MAGISTRATE JUDGE